IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

M.M.[1]                              :          CIVIL ACTION
                                     :
          v.                         :
                                     :
FRANK BISIGNANO,                     :          NO.  23-3015
Commissioner of Social Security      :

## MEMORANDUM AND ORDER

ELIZABETH T. HEY, U.S.M.J.                              October 15, 2025

     Plaintiff seeks review of the Commissioner's decision denying his application for

disability insurance benefits ("DIB").  For the reasons that follow, I conclude that the

decision of the Administrative Law Judge ("ALJ") is not supported by substantial

evidence and remand the Commissioner's decision.

## I.   PROCEDURAL HISTORY

     Plaintiff applied for DIB on May 22, 2021, alleging disability as of the previous

day, tr. at 90, 188,[2] based on obesity, chronic fatigue syndrome ("CFS"), brain fog and

inability to concentrate, arthritis in his neck, sleep apnea, elevated antibodies for Epstein-

Barr, severe insomnia, depression, anxiety, and post-traumatic stress disorder.  Id. at 228.

His application was denied initially, id. at 72-89, and on reconsideration, id. at 91-98, and

---

[1]Consistent with the practice of this court to protect the privacy interests of
plaintiffs in social security cases, I will refer to Plaintiff using his initials.  See Standing
Order – In re:  Party Identification in Social Security Cases (E.D. Pa. June 10, 2024).

[2]To be entitled to DIB, Plaintiff must establish that he became disabled on or
before his date last insured.  20 C.F.R. § 404.131(b).  The Certified Earning Record
indicates and the ALJ found that Plaintiff is insured through the end of December 2026.
Tr. at 18, 195.

he requested an administrative hearing.  Id. at 116-18.  After holding a hearing on June

10, 2022, id. at 40-71, the ALJ issued an unfavorable decision on August 31, 2022.  Id. at

15-31.  The Appeals Council denied Plaintiff's request for review on June 7, 2023, id. at

1-3, making the ALJ's August 31, 2022 decision the final decision of the Commissioner.

20 C.F.R. §§ 404.981.  Plaintiff sought review in this court on August 7, 2023 (Doc. 1),

and the matter is now fully briefed and ripe for review.  Docs. 7-9.[3]

## II.    <u>LEGAL STANDARD</u>

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); <u>Schaudeck v. Comm'r</u>

<u>of Soc. Sec.</u>, 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusions that

Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion," and must be "more than a mere

scintilla."  <u>Zirnsak v. Colvin</u>, 777 F.2d 607, 610 (3d Cir. 2014) (quoting <u>Rutherford v.</u>

<u>Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)); <u>see also</u> <u>Biestek v. Berryhill</u>, 587 U.S. 97,

103 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion'") (quoting <u>Consol. Edison Co. v.</u>

<u>NLRB</u>, 305 U.S. 197, 229 (1938)).  The court has plenary review of legal issues.

<u>Schaudeck</u>, 181 F.3d at 431.

---

[3]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C.
§ 636(c).  <u>See</u> Standing Order – In Re: Direct Assignment of Social Security Appeals to
Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 4.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

> 1.    Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.    If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities that has lasted or is expected to last for a continuous period of 12 months;
>
> 3.    If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.    If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and
>
> 5.    If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. § 416.920(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of his age,

education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

## III.    DISCUSSION

### A.    ALJ's Findings and Plaintiff's Claims

In the August 31, 2022, decision, the ALJ found at step one that Plaintiff has not engaged in substantial gainful activity since May 21, 2021, his alleged onset date.  Tr. at 20.  At step two, the ALJ found that Plaintiff suffers from several severe impairments; CFS, hypogonadism, Epstein Barr virus exposure, depression, and residential mold exposure.  Id.  At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Listings.  Id. at 22.

The ALJ determined that Plaintiff retains the RFC to perform sedentary work with the following modifications: occasionally push/pull in the upper extremities and perform postural activities; never crawl or climb ladders, ropes, or scaffolds; avoid concentrated exposure to hazardous machinery and unprotected heights with no more than occasional exposure to pulmonary irritants and extreme temperatures; avoid environments with bright or flickering lights and more than moderate noise; may need to alternate positions once or twice per hour; frequently perform manipulative maneuvers; perform simple routine tasks, understand, remember, and carry out simple instructions, and make simple-work related decisions.  Id. at 24.  Based on this RFC and the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could not perform his past relevant work as a

systems analyst.  Id. at 29.  However, the ALJ concluded that Plaintiff is not disabled, because he can perform other work that exists in the national economy.  Id. at 29-30.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to analyze or discuss in detail the results of cardiopulmonary exercise testing ("CPET") that Plaintiff underwent in February and March of 2022.  Doc. 7 at 6.  Defendant responds that the ALJ was not required to consider the CPET testing. Doc. 8 at 1, 5-7.

### B.    Plaintiff's Claimed Limitations and Testimony at the Hearing

Plaintiff was born on May 21, 1977, and thus was 44 years of age when he applied for DIB (May 22, 2021) and 45 at the time of the ALJ's decision (August 31, 2022).  Tr. at 45, 72.  He graduated from college and received master's degrees in business administration and information technology and management.  Id. at 50, 229.  For over 14 years, until the day before his disability onset date, Plaintiff worked for Wells Fargo as a business systems consultant.  Id. at 58-59, 230.  During much of his final year, he was on employer-based short-term disability leave.  Id. at 51.

At the administrative hearing, Plaintiff testified that he is unable to work due to severe fatigue.  Tr. at 50.  He stated that he spends approximately 20-to-22 hours per day lying in bed or reclining.  Id.  He reported that he can only concentrate for 30 minutes to an hour before becoming dizzy, confused, and loses track of what is being communicated.  Id.  He described needing to rest for about 2 hours after every 30 minutes of concentration.  Id. at 51.  Plaintiff also testified to difficulties communicating with

others, noting that he tends to ramble, loses track of his thoughts, struggles to find words, and has difficulty making decisions.  Id.

Regarding physical limitations, he stated that he can walk for about 5 minutes before needing a break, sit for 30 minutes, stand for 15 minutes, and lift no more than about 10 pounds.  Tr. at 55-56.  In terms of daily activities, Plaintiff testified that he showers every 3 to 4 days, prepares simple meals using a microwave or cereal, and is able to do laundry and load a dishwasher.  Id. at 56.  To occupy his time, he occasionally checks a social media CFS support group, plays a casino game on his tablet, and reads or watches television while lying in bed or on the recliner.  Id. at 57-58.  As of the hearing date, his medication regimen included Naltrexone[4] and medications to regulate his hormones and aid sleep.  Id. at 53.

Plaintiff testified that he relies on his mother, who lives out of state, to stay with him for 2 to 4 weeks at a time every 2 to 3 months in order to help clean his apartment, assist with meal preparation, and drive longer distances.  Tr. at 63.[5]

Plaintiff also testified that he had experienced chronic fatigue symptoms for years, but his condition significantly worsened in 2019.  Tr. at 51.  After treatment for severe

---

[4]Naltrexone is typically used to treat opioid use disorder and alcohol use disorder. See https://www.drugs.com/naltrexone.html (last visited Sept. 29, 2025).

[5]The ALJ denied Plaintiff's request to have his mother testify at the hearing, stating that the hearing had already exceeded its allotted one-hour duration and that Plaintiff had not provided advance notice that Plaintiff sought her testimony.  Tr. at 64-65.  The medical record reflects that Plaintiff's mother plays an active role in his treatment and in managing his affairs.

mold exposure failed to resolve his fatigue, and following antibody testing, his primary

care physician, Dr. William Kracht, D.O., diagnosed him with CFS. Id. at 62-63.

Regarding his February/March 2022 CPET testing, Plaintiff explained that he

underwent the test after learning through chronic fatigue support groups and other

resources that it was considered the best test to demonstrate CFS, and because his doctors

strongly recommended it. Tr. at 61-62. Following the test, he described needing the

entire month of March to recover from the resulting fatigue, during which he was

bedridden and unable to manage basic tasks such as grocery shopping or laundry. Id. at

62.

A VE also testified at the administrative hearing. Tr. at 67-70. Based on the

hypothetical posed by the ALJ with the limitations included in the ALJ's RFC

assessment, see supra at 4, the VE testified that such an individual could not perform

Plaintiff's past relevant work. Id. at 67-68. However, the VE testified that there exist

other jobs in the national economy that such an individual could perform, such as final

assembler, waxer, and dowel inspector. Id. at 68. In response to questioning by

Plaintiff's counsel, the VE testified that if the individual were required to miss 2 days of

work per month on a continuing and unscheduled basis, or if the individual needed to lie

down for an hour outside of regular work breaks during the workday, he would be unable

to perform any full-time work. Id. at 69.

## C.    **Medical Evidence Summary**

The medical evidence reflects that Plaintiff complained of spells of decreased

attentiveness, memory and communication skills and difficulty concentrating as early as

2018.  See, e.g., tr. at 348-51, 358.  Plaintiff reported to medical providers that these symptoms first began around 2009.  Id. at 485, 1014, 1086.

In April of 2019, Plaintiff began seeing Dr. Kracht for primary care.  Tr. at 467. With respect to Plaintiff's chronic fatigue disorder and residential mold exposure,[6] the doctor noted associated symptoms of concentration and focus impairment, staring spells, imbalance, and headaches.  Id.  Follow-up testing revealed the presence of Epstein-Barr virus antibodies.  Id. at 478.[7]  Between May 2019 and April 2021, before the alleged disability onset date, office visits generally documented that Plaintiff described his fatigue as moderate to severe.  See id. at 478, 485, 492, 500, 517, 525, 533, 542, 552, 560, 575.  He reported that his condition was worsening and aggravated by stress, exertion, exercise, and emotional distress, see, e.g., id. at 500, although some visits noted improvement with rest and new medications or treatments.  See id. at 490, 575, 834.  In an entry on July 22, 2020, Plaintiff stated that maintaining his job required all of his energy, and that he could usually complete the workday depending on his energy level but felt exhausted afterward.  Id. at 552.

On May 21, 2021, Plaintiff's disability onset date, Dr. Kracht's notes indicate that Plaintiff reported his chronic fatigue as "incapacitating" in severity and occurring daily.

---

[6]Plaintiff reported that his condominium had remained flooded for an extended period, after which he consulted a neurologist for related symptoms and was diagnosed with mold exposure.  Tr. at 1149.  Dr. Kracht treated Plaintiff for mold exposure from 2019 until sometime in 2020, at which point testing showed that treatment had successfully reduced his toxin levels.  See id.

[7]Epstein-Barr virus is a herpes virus that causes infectious mononucleosis. Dorland's Illustrated Medical Dictionary, 33rd ed. (2020) ("DIMD"), at 631, 843.

Tr. at 841.  Plaintiff reported being able to climb stairs and dress himself, but found it difficult to complete errands in the community, cook, and walk household and community distances.  Id.  On July 11, 2021, Dr. Kracht opined that Plaintiff was totally impaired, that he was unable to work and should apply for disability, and recommended the two-day CPET test.  Id. at 846.[8]

On July 29, 2021, Plaintiff presented virtually for a consultation with neurologist, Svetlana Blitshteyn, M.D., seeking a second opinion on his diagnosis of CFS/ME.[9]  Tr. at 959, 962.  The intake nurse noted that Plaintiff was diagnosed with CFS/ME in 2019, that Plaintiff reported experiencing brain fog, confusion, decreased concentration, poor memory, insomnia, and unrestful sleep, and that exercise made him feel sick.  Id. at 959.  Chronic fatigue and pseudodementia[10] were listed as diagnoses.  Id.  Dr. Blithsteyn recommended a "tilt table test" to evaluate whether Plaintiff had postural orthostatic tachycardia syndrome ("POTS"), neurocardiogenic syncope, or orthostatic hypotension.  Id. at 962.  The doctor further advised that Plaintiff begin a low dose of a beta blocker, take antihistamines, increase salt and fluid intake, engage in regular exercise, and make dietary changes.  Id. at 962-63.  Dr. Blithsteyn also recommended continued psychiatric

---

[8]As will be seen, the CPET testing did not take place until early 2022.

[9]Myalgic encephalomyelitis ("ME") is a name used interchangeably with CFS. DIMD at 607.

[10]Pseudodementia resembles dementia but is not due to organic brain disease, is potentially reversible by treatment, and is usually due to depression or other psychiatric disorder.  DIMD at 1518.

care.  Id. at 961.  Post-visit diagnoses were listed as CFS with a question of autonomic

dysfunction, low testosterone, and cognitive dysfunction.  Id. at 962.

On September 14, 2021, Preksha Patel, N.P., performed a consultative physical

evaluation.  Tr. at 1014-18.  Plaintiff's chief complaint was recorded as fatigue,

accompanied by generalized aches, difficulty getting out of bed, and impaired ability to

perform daily tasks due to tiredness.  Id. at 1014.  Symptoms were noted as being

consistent with low testosterone.  Id.  Plaintiff reported that these symptoms "come and

go."  Id.  He stated that he did not exercise and spent most of his time sleeping,

describing brain fog with diminished concentration, memory, and critical thinking ability,

as well as difficulty recalling dates and times.  Id.  It was noted that Epstein-Barr was

diagnosed based on blood testing in 2019, although Plaintiff did not currently exhibit

significant symptoms related to an ongoing viral infection.  Id. at 1015.  It was also noted

that Plaintiff lived with his brother, did not require assistance at home, and remained

independent with activities of daily living.  Id.  at 1015-16.  Plaintiff reported that when

fatigue and concentration allowed, he was able to drive, cook, clean, do laundry, and

shop, and that he showered and dressed himself daily.  Id. at 1016.  He also stated that he

enjoyed watching television, reading, and painting.  Id.  Ms. Patel listed Plaintiff's

diagnoses as chronic fatigue, obesity, sleep apnea, insomnia, Epstein-Barr virus, and low

concentration, with a fair prognosis.  Id. at 1017-18.

In a Medical Source Statement of Ability to Do Work-Related Activities

(Physical) ("Physical MSS"), Ms. Patel reported that Plaintiff could lift and carry up to

20 pounds continuously and 100 pounds frequently.  Tr. at 1019.  The nurse practitioner

opined that Plaintiff could sit for 4 hours without interruption, stand for 3 hours, and walk for 3 hours, with a total capacity of 8 hours sitting, 6 hours standing, and 6 hours walking in a workday. Id. at 1020. Plaintiff could reach, handle, and finger continuously, but could push and pull only frequently, with all limitations attributed to fatigue and obesity. Id. at 1021. Ms. Patel further opined that Plaintiff could frequently climb stairs and ramps, climb ladders or scaffolds, balance, and stoop; occasionally kneel, crouch, and craw, and could frequently be exposed to unprotected heights, moving mechanical parts, extreme cold and heat, and loud noise. Id. at 1022-23. Ms. Patel noted that Plaintiff can shop, travel without a companion for assistance, ambulate without assistance, walk a block at a reasonable pace on uneven surfaces, use public transportation, climb a few steps at a reasonable pace with the use of a single handrail, prepare a simple meal and feed himself, care for his personal hygiene, and sort, handle, and use paper/files. Id. at 1024.

On September 15, 2021, Plaintiff was seen by cardiologist Suman Jazwal, M.D., for a cardiovascular work-up. Tr. at 1127. Plaintiff reported chronic fatigue, dyspnea (shortness of breath) on exertion, and palpitations, noting that his symptoms were episodic and had begun in 2009. Id. It was further noted that Plaintiff had recently been seen by Dr. Blithsteyn, who recommended testing for POTS. Id. Dr. Jazwal referred Plaintiff for an echocardiogram, Holter monitor, tilt table test, and bloodwork, noting that POTS was unlikely given the intermittent nature of Plaintiff's symptoms. Id. at 1129.

On September 22, 2021, state agency consultant Charles Joseph Hubbard, Jr., M.D., reviewed Plaintiff's medical records in connection with an initial disability

determination relating to Plaintiff's reported physical impairments. Tr. at 85. Dr. Hubbard found that Plaintiff could occasionally lift and carry up to 20 pounds and frequently up to 10 pounds; could stand and/or walk for 6 hours in an 8-hour workday; and could sit for 6 hours. Id. at 83. Plaintiff had no limitations in pushing or pulling, but exertional activities were exacerbated by fatigue and obesity. Id. Dr. Hubbard further noted that Plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and could occasionally climb ladders, ropes, or scaffolds. Id. at 83-84. It was noted that Plaintiff should avoid concentrated exposure to extreme heat, wetness, fumes, odors, dusts, gases, poor ventilation, and workplace hazards such as heights and machinery. Id. at 84-85.

On October 25, 2021, Dr. Kracht completed a Physical MSS for Plaintiff's disabilities, opining that Plaintiff could sit for only 0-2 hours in an 8-hour workday and stand for 1 hour. Tr. at 1046. Plaintiff could occasionally lift less than 10 pounds, rarely lift 10 pounds, and never lift more than that. Id. Dr. Kracht further opined that Plaintiff could only occasionally perform pushing and pulling with both upper and lower extremities, and could only occasionally reach, handle, finger, and feel. Id. Dr. Kracht rated Plaintiff's interference with attention and concentration required for even simple work tasks as constant and stated that Plaintiff must avoid exposure to extreme temperatures and humidity/wetness, would require unscheduled breaks every 30-60 minutes lasting 60-90 minutes, and would likely be absent from work 4 or more days per month. Id. at 1047.

On November 2, 2021, Plaintiff presented to Patricia A. Latta, CRNP, MSN, upon referral from Dr. Jaswal.  Tr. at 1052, 1055.  Plaintiff reported new cardiovascular concerns, including dizziness.  Id. at 1052.  Ms. Latta noted that Plaintiff did not engage in regular aerobic exercise due to fatigue and exertional shortness of breath, that he was able to walk 2 blocks before stopping, and that he could climb 1 flight of stairs before needing to stop.  Id.  His exercise tolerance was described as limited by fatigue, tachycardia, and dizziness.  Id.  On examination, Plaintiff appeared hypertensive with negative orthostatic blood pressure readings.  Id. at 1055.  Ms. Latta advised Plaintiff to monitor his blood pressure at home daily and to contact his cardiologist regarding initiation of medication if elevated readings persisted.  Id.  Plaintiff was scheduled for a tilt table test later that week.

On November 10, 2021, Plaintiff had a follow-up visit with Dr. Jazwal.  Tr. at 1086.  In a letter to Dr. Kracht, Dr. Jazwal summarized Plaintiff's prior test results, concluding that he appeared stable from a cardiovascular standpoint.  Id. at 1088.  Plaintiff's blood pressure was reasonably controlled, the Holter monitor demonstrated a normal heart rate response without arrhythmias, his bloodwork was unremarkable, the echocardiogram revealed no significant abnormalities, and the tilt table test was not consistent with POTS.  Id.

On November 29, 2021, Plaintiff had a telemedicine visit with endocrinologist Claudia Gragnoli, M.D.  Tr. at 1161.  Plaintiff reported that his fatigue was so debilitating that he could not look for a job or do any physical activity, and that physical activity made him sicker.  Id. at 1162.  He described his fatigue symptoms as a "rollercoaster"

fluctuating over the years.  Id.  He also complained of intermittent brain fog, cognition, concentration problems, memory problems, both past and recent.  Id.  He reported not being able to manage cooking, and that his mother recently stayed with him and helped him prepare meals.  Id.  Dr. Gragnoli noted that recent testing for Epstein-Barr virus including testosterone and estrogen were "off."  Id.  The doctor recommended that Plaintiff make dietary changes and try vitamins/holistic medications, and that he check his air conditioning for mold residue, among other things.  Id. at 1165-67.

On November 30, 2021, Plaintiff had a follow-up telemedicine visit with Dr. Blithsteyn.  Tr. at 1137.  Dr. Blithsteyn remarked that the tilt table test showed postural tachycardia below the threshold to diagnose POTS and hypertension.  Id. at 1140.  However, the doctor noted that his tilt table test results and clinical history are consistent with an autonomic dysfunction, and that low testosterone and elevated estrogen in men can be associated with autonomic dysfunction, chronic fatigue, mood disturbance and cognitive complaints.  Id. at 1141.  Therefore, Dr. Blithsteyn concluded that Plaintiff's hormonal imbalance plays a major role in his chronic symptoms.  Id.  She recommended medications and dietary changes, and that Plaintiff consider restarting testosterone treatments.  Id. at 1141.

On January 27, 2022, state agency consultant Gene Whang, M.D., reviewed Plaintiff's medical records as part of Plaintiff's request for a reconsideration of his disability claim.  Tr. at 96-97.  Dr. Whang opined that Plaintiff could frequently lift and carry up to 20 pounds and occasionally up to 10 pounds; could stand, walk, and sit for 6 hours in an 8-hour workday; could occasionally climb stairs or ramps, balance, stoop,

kneel, crouch, and crawl; but could never climb ladders, ropes, or scaffolds.  Id. at 95-96.

Dr. Whang also found that Plaintiff had no environmental limitations except that he

should avoid concentrated exposure to noise.  Id. at 96.  Dr. Whang noted that the

opinions of Ms. Patel and Dr. Kracht were partially consistent with the record.  Id. at

97.[11]

On January 28, 2022, Plaintiff participated in a follow-up telemedicine visit with

Dr. Gragnoli, noting that CFS remained Plaintiff's primary issue.  Tr. at 1149.  The

doctor noted that Plaintiff had attempted some of her prior recommendations but not

others, id. at 1150-51, and that the interventions he did try were ineffective.  Id. at 1153.

Dr. Gragnoli provided treatment recommendations similar to those she had previously

given.  Id. at 1154-55.

On February 28 and March 1, 2022, Plaintiff underwent CPET testing at Ithaca

College, under the direction of Betsy Keller, Ph.D., to assess his exercise tolerance and

recovery from exertion.  Tr. at 1366-67.[12]  Each day of testing required Plaintiff to use a

stationary bike on a ramp that increased by 15 watts per minute, continuing to the point

of maximal exertion, and was terminated when Plaintiff could no longer proceed due to

---

[11]As will be discussed, Dr. Hubbard's and Dr. Whang's reviews predated
Plaintiff's CPET testing.

[12]This testing took place in the college's department of Exercise Sciences and
Human Performance, tr. at 1366, and Dr. Keller is identified as a member of the
American College of Sports Medicine.  Id. at 1466.  Plaintiff represents that Dr. Keller
has masters and doctoral degrees in Exercise Science, but this information is not in the
record.  Doc. 9 at 2.

exercise limitation.  Id. at 1369.[13]  The report describes objective measures used to assess

whether the subject gives maximum effort, which Dr. Keller determined Plaintiff gave.

Id. at 1369-70.  Prior to testing, Plaintiff self-reported his relevant medical, exercise, and

employment history, which included mention that prior to the onset of his condition, he

used to exercise 2 times per week for 45 minutes.  Id. at 1368.

Dr. Keller discussed several measurements taken during testing that are relevant to

assessing an individual's exercise tolerance and recovery capabilities, including peak

oxygen consumption ("VO2 peak"), which is the highest amount of oxygen one's body

can utilize during a specific exercise session.  Tr. at 1370-71.  Dr. Keller observed that

Plaintiff reached or approached his maximum work capacity when performing minimal

activities, such as walking around the house or walking very slowly on a firm level

surface, whereas walking at a moderate pace around the workplace would exceed his

VO2 peak.  Id. at 1370.  Dr. Keller opined that Plaintiff had a moderate to severe

impairment of VO2, remarking that his VO2 peak was equivalent to the average inactive

83-year-old male, and that his decline in functional capacity was due to underlying

pathophysiology rather than normal age-related depreciation.  Id. at 1370-71.

Dr. Keller also noted a severe impairment in Plaintiff's ventilatory/anaerobic

threshold ("VAT"), which Dr. Keller explained is the point during incremental exercise

when production of energy is derived increasingly through anaerobic versus aerobic

---

[13]Dr. Keller identified a technical error on the second day of testing that prevented
the measurement of expired air volume and related derived variables.  Tr. at 1369,1467.
She explained that her conclusions regarding those variables were based solely on the
first test.  Id.  The impact of this error may be further explored on remand.

metabolism. Tr. at 1371. Dr. Keller emphasized that even simple daily activities, such as

standing, eating, or shaving, require Plaintiff to perform at or near his maximum VAT.

Id. More demanding tasks, like walking from his house to the car or preparing for bed,

exceed this threshold and trigger symptom exacerbation. Id. In practical terms, Dr.

Keller explained that Plaintiff has a very low exertional threshold, and once this threshold

is surpassed, he primarily depends on anaerobic energy production, leading to significant

fatigue and worsening of symptoms. Id. at 1372.

Dr. Keller concluded that Plaintiff had a mild-to moderate impairment of

ventilation ("Ve"), which Dr. Keller explained as the ability to ventilate sufficiently to

exchange gas in the lungs. Tr. at 1372. With respect to hemodynamic response, which

includes measures such as blood pressure, heart rate, and oxygen saturation, Dr. Keller

noted that Plaintiff showed an exaggerated blood pressure response to incremental

exercise, which is indicative of orthostatic hypertension or dysautonomia. Id. at 1373.

Dr. Keller had Plaintiff complete surveys assessing pain and fatigue symptoms

both before and after testing. Tr. at 1374. Dr. Keller explained that most inactive but

otherwise healthy individuals typically recover from testing within 24 to 36 hours. Id. In

contrast, Plaintiff reported an abnormal response to exertion consistent with post-

exertional malaise, a hallmark symptom of CFS. Id. at 1374-75. His reported post-test

symptoms were indicative of significant exercise intolerance, persistent fatigue, and post-

exertional malaise. Id. at 1375.

Dr. Keller explained that an objective assessment of an individual's capacity to

perform required job duties without undue fatigue may be most closely determined by

17

relating energy requirements of the job to an individual's aerobic capacity.  Tr. at 1375.

She opined that Plaintiff would be unable to tolerate sedentary work full or part-time, on

a sustained basis, without exacerbating his symptoms, noting that the cognitive effort

required when reading, doing computer work, or interacting with a client could

exacerbate illness symptoms.  Id.  Dr. Keller also concluded that ventilatory dysfunction

and dysautonomia are significant contributors to Plaintiff's exertion intolerance and

ongoing symptoms.  Id.  She explained that sustained work would likely worsen his

symptoms and accelerate his illness, requiring him to miss significant time from work.

Id. at 1376.

From March 2022 through May 2022, Plaintiff received chiropractic treatment at

Curran Chiropractic Center, P.C., at Dr. Keller's recommendation.  Tr. at 1481-93.

Treatment notes indicate that Plaintiff reported feeling better after sessions, see tr. 1484-

86, although at times he described his condition as "up and down."  Id. at 1482, 1484.

An April 2022 note reflects that Plaintiff experienced improved sleep, tr. at 1484, and a

May 2022 note reflects that Plaintiff's thyroid medication was beginning to help.  Id. at

1482.

### D.    Plaintiff's Claims and the ALJ's Opinion

Plaintiff argues that the ALJ improperly discounted the CPET results and related

medical source statements from Dr. Keller, rendering the RFC assessment unsupported

by substantial evidence.  Doc. 7 at 3, 7; Doc. 9 at 1-3.  Plaintiff asserts that the ALJ failed

to explain how she considered both the supportability and consistency of Dr. Keller's

opinion and that because Dr. Keller is a specialist, her opinion should be considered more

persuasive.  Doc. 7 at 7-8.  Defendant responds that the ALJ was not required to evaluate

Dr. Keller's findings under the medical opinion framework because Dr. Keller does not

qualify as a "medical source."  Doc. 8 at 5-6.  Even assuming she does, Defendant argues

that Dr. Keller's opinion does not constitute a "medical opinion," but rather an opinion on

an issue reserved to the Commissioner, which the regulations provide are neither valuable

nor persuasive, and need not be addressed in the ALJ's opinion.  Id. at 6-7.  Defendant

also contends that the ALJ adequately discussed the medical evidence in Dr. Keller's

report and reasonably concluded that Dr. Keller's findings did not impose greater

limitations than those already reflected in Plaintiff's RFC.  Id. at 8-10.

      The ALJ's consideration of medical opinion evidence is governed by regulations

which focus on the persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight,
> including controlling weight, to any medical opinion(s) or
> prior administrative medical finding(s), including those from
> your medical sources.

20 C.F.R. § 404.1520c(a).[14]  The regulations list the factors to be utilized in considering

medical opinions: supportability, consistency, treatment relationship including the length

and purpose of the treatment and frequency of examinations, specialization, and other

factors including familiarity with other evidence in the record or an understanding of the

disability program.  Id. §404.1520c(c).  The most important of these factors are

supportability and consistency, and the regulations require the ALJ to explain these

---

[14]In contrast, the regulations governing applications filed before March 17, 2017, spoke in terms of the weight to be given each opinion, including controlling weight for the opinions of certain treating sources.  20 C.F.R. § 404.1527.

factors, but do not require discussion of the others.  Id. § 404.1520c(b)(2).  The

regulations explain that "[t]he more relevant the objective medical evidence and

supporting explanations presented by a medical source are to support his or her medical

opinion(s) . . . , the more persuasive the medical opinions . . . will be."  Id.

§ 404.1520c(c)(1).  Similarly, "[t]he more consistent a medical opinion(s) . . .  is with the

evidence from other medical sources and nonmedical sources . . . , the more persuasive

the medical opinion(s) . . . will be."  Id. § 404.1520c(c)(2).

Importantly, these considerations only apply to medical opinions, which are

defined as "statement[s] from a medical source about what you can still do despite your

impairment(s) and whether you have one or more impairment-related limitations or

restrictions in the following abilities . . . ."  20 C.F.R. § 404.1513.  A "medical source" is

further defined as "an individual who is licensed as a healthcare worker by a State and

working within the scope of practice permitted under State or Federal Law, or an

individual who is certified by a State as a speech-language pathologist or a school

psychologist and acting within the scope of practice permitted under State or Federal law.

Id. § 404.1502(d).

An ALJ must also weigh and consider all "non-medical evidence" before her.

Burnett v. Commissioner of SSA, 220 F.3d 112, 122 (3d Cir. 2000).  Non-medical

evidence includes information or statements from sources other than medical

professionals that relate to any issue relevant to the individual's claim.  See 20 C.F.R.

§ 404.1513(a)(4).  Such sources may include, but are not limited to, the claimant,

educational personnel, social welfare agency staff, family members, caregivers, friends,

neighbors, employers, and clergy.  Id. § 404.1502(e).  Although the ALJ is not required to articulate the supportability and consistency factors when evaluating non-medical evidence, as required for medical opinions, see id. § 404.1520c(d), she must still provide some degree of articulation when evaluating evidence from nonmedical sources.  See Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) ("The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects."); see also Alyssa W. v. O'Malley,  Civ. No. 22-919, 2024 WL 416392, at *11-12 (M.D.N.C. Feb. 5, 2024) (courts have held that 20 C.F.R. § 404.1520c(d) did not eliminate the requirement that ALJs provide some degree of articulation, and courts continue to expect ALJs to explain their evaluation of evidence from non-medical sources).

Here, the ALJ summarized the medical evidence of Plaintiff's mental and physical impairments, as well as Plaintiff's testimony and subjective complaints, and concluded that the medical evidence did not demonstrate that Plaintiff suffers from any disabling limitations, and that he retained the RFC to perform a limited range of sedentary work. Tr. at 24-26.  She found that Plaintiff's medically determinable impairments could reasonably be expected to cause some symptoms, but that Plaintiff's statements regarding the intensity, persistence, and limiting effects of those symptoms were not fully consistent with the medical and other evidence in the record.  Id. at 25-27.  In making this determination, the ALJ found the opinions of Dr. Hubbard and Dr. Whang that Plaintiff could perform light exertional work to be "somewhat persuasive," and similarly found Ms. Patel's optimistic opinions regarding Plaintiff's exertional capabilities "partially persuasive," because these three medical sources did not have the benefit of later-

submitted evidence demonstrating that the Plaintiff's exertional capabilities were more limited.  Id. at 27-28.  By contrast, the ALJ found Dr. Kracht's opinion that Plaintiff had severe exertional limitations to be "not persuasive."  Id.  The ALJ further explained that her RFC assessment was supported by the overall medical evidence, including grossly normal examination findings, conservative treatment history, and Plaintiff's ability to care for himself and manage his household.  Id. at 29.

Regarding the CPET results, the ALJ acknowledged that Plaintiff "underwent a cardiopulmonary exercise test that revealed dysautonomia, which was reported as causing his symptoms such as fatigue, cognitive dysfunction, and post-exertional malaise."  Tr. at 26.  However, the ALJ rejected Dr. Keller's related opinion that Plaintiff is "unable to perform even sedentary-level work on a sustained basis," id. at 1366, concluding that it was a statement on an issue reserved to the Commissioner.  Id. at 29.  Accordingly, the ALJ stated that no written analysis was required under 20 C.F.R. § 404.1527(d),[15] as such statements are "neither inherently valuable nor persuasive."  Id.  The ALJ made no further mention of the CPET results.

As noted above, an ALJ must explain her consideration of the supportability and consistency factors when determining whether medical opinion evidence is persuasive.  20 C.F.R. § 404.1520c(b)(2).  That requirement, however, applies only to medical

---

[15]The Commissioner acknowledged that the ALJ cited a provision from the prior regulatory scheme addressing issues reserved to the Commissioner.  Doc. 8 at 7 n.2.  He attributed this miscitation to a "scrivener's error," explaining that the ALJ nonetheless addressed the substance of the currently applicable regulation, 20 C.F.R. § 404.1520b. Id.

opinion evidence. Id. The Commissioner is correct that Dr. Keller does not qualify as a medical source under the governing regulations, as she does not meet the listed criteria. See id. § 404.1502(d).[16] This remains true notwithstanding Dr. Keller's doctorate in exercise science, her position as a professor in the Department of Exercise and Sports Sciences at Ithaca University, and membership in the American College of Sports Medicine. See id. § 404.1502(d).[17] Nevertheless, the ALJ must consider this "non-medical evidence" and give some reason for discounting it. Plummer, 186 F.3d at 429. Here, the Commissioner offered only a cursory, one-sentence summary of the CPET testing, noting that it revealed dysautonomia which was reported as causing Plaintiff's symptoms. Tr. at 26. The only other reference in the opinion is that Dr. Keller's opinion that Plaintiff is unable to perform sedentary work is an issue reserved to the Commissioner and therefore not persuasive. Id. at 29. However, the ALJ failed to

---

[16]Plaintiff does not seriously contest this point. In his opening brief he asserts that Dr. Keller "appears to qualify" as a medical source, Doc. 7 at 7, and he does not revisit the argument in his reply brief. Doc. 9.

[17]It is worth noting that other ALJs and reviewing courts in other jurisdictions have evaluated non-physician opinion evidence based on CPET reports in Social Security appeals, applying the supportability and consistency factors to their analysis. See, e.g., Clemmons v. Berryhill, No. 18-578, 2019 WL 3852495, at *14, 17 (N.D. Cal. June 27, 2019) (ALJ discounted opinions of Christopher Snell, Ph.D., because they were based on one-time testing and inconsistent with opinions of other medical sources and with the plaintiff's reported activities; on remand ALJ should reconsider potential for using CPET results to diagnose CFS); C.B. v. O'Malley, No. 22-5579, 2024 WL 1329920, at *7-9 (N.D. Cal. Mar. 27, 2024) (ALJ improperly discounted as unsupported and not persuasive Dr. Snell's opinions arising from CPET test); Courcelle v. Kijakazi, No. 20-2920, 2022 WL 2398524, at *7 (E.D. La. June 3, 2022) (considering Dr. Snell's opinion based on CPET test and concluding that ALJ did not err in finding it not persuasive).

meaningfully engage with the scientific evidence contained in the report.  The ALJ thus

ignored pertinent evidence or disregarded the evidence for no reason or the wrong reason,

and remand is appropriate.  See Plummer, 186 F.3d at 429.[18]

The ALJ's omission is particularly significant because the interpretive rulings

expressly recognize that CPET testing is a Social Security Administration-approved

method for establishing the existence and severity of a medically determinable

impairment due to CFS, a condition that is notoriously difficult to diagnose and has few

objective markers.  See C.B., 2024 WL 1329920, at *5, 8 (citing Social Security Ruling,

SSR 14-1p: Titles II and XVI: Evaluating Claims Involving Chronic Fatigue Syndrome,

2014 WL 1371245, at *2, 5 (Apr. 3, 2014)).  The ALJ therefore should have given some

reason for rejecting the limitations described in the CPET report, especially given the

significant emphasis placed on those results by Plaintiff's representative during the

administrative hearing.  See tr. at 44 (attorney argued at hearing that CPET testing

evidenced severe autonomic dysfunction and showed Plaintiff has aerobic and anerobic

thresholds of 83-year-old man); cf. Clemmons, 2019 WL 3852495, at *17 (ALJ should

give more consideration to the use of CPET in diagnosing CFS on remand).

And while the Commissioner is correct that Dr. Keller's opinion that Plaintiff is

unable to sustain sedentary work is "neither valuable nor persuasive" because it is on an

issue reserved to the Commissioner, see 20 C.F.R. § 404. 1520b(c)(3)(i), the ALJ reduced

Dr. Keller's extensive findings presented in an 11-page narrative report, supported by

---

[18] The ALJ did not rely on Dr. Keller not being a medical source.  She even
mistakenly referred to her as a physician.  Tr. at 29.

nearly 70 pages of objective measurements, into a single sentence contained on the very first page of the report. The ALJ failed to address Dr. Keller's other findings, such as that Plaintiff reaches or approaches his VO2 peak when performing minimal activities (and listing which daily life activities correlate with those energy requirements); that he has a very low exertional threshold and once this threshold is surpassed, he primarily depends on anaerobic as opposed to aerobic energy production, leading to significant fatigue and worsening of symptoms; that his reported post-test symptoms were indicative of significant exercise intolerance, persistent fatigue, and post-exertional malaise; and that the energy requirements to perform sedentary work would exacerbate his symptoms and illness progression and necessitate that he miss significant time from work. Tr. at 1368-76. These are not issues "reserved to the Commissioner," but rather provide objective measurements related to Plaintiff's impairment and limitations.

The ALJ's superficial analysis of the CPET results closely parallels the circumstances in C.B., where the court remanded for further proceedings after concluding that the ALJ's evaluation of the CPET results and related opinions from Dr. Snell was inadequately explained and not supported by substantial evidence. 2024 WL 1329920, at *9. In that case, the ALJ discounted Dr. Snell's findings in part because they purportedly consisted of "only two sentences with conclusion of work preclusions" and were therefore vague and conclusory. Id. at *7. The court disagreed, pointing out that those "two sentences" were actually the introductory paragraph of the CPET Evaluation Report, which also contained a description of the testing procedure, detailed results, a more thorough summary of Dr. Snell's conclusions, and an extensive discussion of

multiple aspects of the CPET findings.  Id.  Remand is warranted here for the same reasons.

On remand, the ALJ may benefit from obtaining the agency consultants' review of the CPET results.  Cf. Clemmons, 2019 WL 3852495, at *14 (ALJ accepted the consultative physician's rationale for discounting CPET results and concluded that Dr. Snell's opinions based on CPET testing should be afforded little weight); C.B., 2024 WL 1329920, at *11-12 (ALJ discounted medical opinion which credited CPET results).

## IV.   **CONCLUSION**

In this case, neither the agency consultants nor Plaintiff's treating physicians had the opportunity to review the CPET results when assessing Plaintiff's limitations, and the ALJ did not meaningful consider those results.  Accordingly, remand is warranted for further evaluation of this evidence, which may include obtaining medical opinion evidence interpreting the CPET results.

An appropriate Order follows.